UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MARY L. ROARK,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )        No.  4:07CV2067 HEA
                                        )                         (TIA)
MICHAEL J. ASTRUE, COMMISSIONER         )
OF SOCIAL SECURITY,                     )
                                        )
            Defendant.                  )

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review

of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social

Security Act and for Supplemental Security Income benefits under Title XVI of the Act.  The case

was referred to the undersigned pursuant to 28 U.S.C. § 636(b).

## I.  Procedural History

On July 8, 2003, Plaintiff filed applications for a Period of Disability, Disability Insurance

Benefits ("DIB"), and Supplemental Security Income ("SSI"), with a protective filing date of June

13, 2003.  (Tr. 17, 34, 69-71, 391-95, 401) Plaintiff alleged disability beginning June 4, 2002 due to

carotid arteries, and back, leg, and neck problems.  (Tr. 57)  Plaintiff's applications were denied on

September 10, 2003, after which Plaintiff requested a hearing before an Administrative Law Judge

(ALJ).  (Tr. 33, 51, 53-7)  On July 14, 2004, Plaintiff appeared and testified at hearing before an ALJ.

(Tr. 402-27)  In a decision dated April 27, 2005, the ALJ determined that Plaintiff had not been under

a disability from June 4, 2002 through the date of the decision.  (Tr. 17-32) On March 3, 2006, the

Appeals Council denied Plaintiff's Request for Review.  (Tr. 2-4)  Thus, the decision of the ALJ

stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel.  Upon questioning by the ALJ, Plaintiff testified that she was 49 years old.  She was separated from her third husband.  She lived alone in a house that she rented.  Plaintiff completed high school.  At the time of the hearing, she measured 5 feet, 3 inches and weighed 189 pounds.  Plaintiff had no income, but her 5 children helped pay her bills.  She did receive Medicaid benefits but not food stamps.  (Tr. 402-09)

Plaintiff further testified that she last worked in April 2003 as a waitress at Don's Diner, a restaurant in Steelville, Missouri.  The job only lasted 2 days because she had a mini stroke and  was taken to the hospital by ambulance.  Her prior job was with the Herring Home Care Center as a home health aid from August 2001 to August 2002.  She quit due to back problems.  Plaintiff stated that she was unable to bend over and lift things.  Plaintiff's primary care physician at the time of the hearing was Dr. Mary Mason.  Plaintiff quit smoking 2 years before the hearing, and she did not drink alcohol or use illegal substances.  She was able to drive, but a friend drove her to the hearing.  Plaintiff did her own laundry and went to the grocery store twice a month.  (Tr. 410-14, 419)

Plaintiff stated that she saw a specialist, Dr. Repeloeg, for her back problems.  Dr. Repeloeg was a neurologist located in St. Louis, Missouri.  Plaintiff testified that she experienced problems with sitting because it hurt her back.  She estimated that she could sit for an hour before needing to get up.  She could only walk 25 feet because the pain in her back caused numbness in her legs and feet.  She could stand for 30 minutes at a time.  Plaintiff further opined that she could lift no more than 5 pounds.  Plaintiff's back pain was located in her lower middle back.  At its worst, her pain was an 8 on a scale from 1 to 10.  Her pain was usually a 7 or 8.  Plaintiff denied having any mental health

problems. Plaintiff wore an elastic bandage on her middle finger to lessen her arthritic pain. (Tr. 414-17)

Plaintiff's attorney also questioned Plaintiff, who testified that she could only drive for 10 minutes before needing to stop and get out due to back and leg pain. In addition, she had trouble climbing stairs. Plaintiff's previous job as a home care worker entailed cooking, cleaning, and taking care of the elderly by performing chores for them. Plaintiff first noticed her heart problems in May of 2002, when she had a mini stroke and went to the ER. The doctors found blockage and later performed surgery on June 4, 2002. Plaintiff explained that the doctors cleaned her artery on the right side and put in a stint. However, the left side was too blocked to make surgery worthwhile. She stated that she continued to have mini strokes about once a month. Plaintiff described these strokes as episodes where the right side of her face went numb. Stress and physical activity brought on the strokes. (Tr. 418-20)

Plaintiff also testified about heart problems, which caused pressure and sharp chest pain. Plaintiff took nitroglycerin when the chest pain occurred. She stated that activity caused the pain. In addition, Plaintiff suffered from arthritis, which she described as very painful and worse during damp and cold weather. Her arthritis was located in her hands, back, and neck. Plaintiff was unable to grasp small objects with her hands. Plaintiff took a number of different medications, including Lovastatin for high cholesterol and Zoloft for anxiety. Plaintiff reported no side effects from her medications. She additionally stated that she experienced shortness of breath with activity. Plaintiff also had difficulties bending and stooping. She described sharp pains in her back and cramping with bending. Plaintiff had trouble sleeping because the pain in her back and legs kept her awake. She could not sleep in a bed and instead slept in a recliner. She estimated that she slept only 3 hours a

night.  Plaintiff used to go fishing and crochet, but she no longer enjoyed these hobbies because she could not sit on the bank or use her hands.  (Tr. 420-25)

At the end of the hearing, the ALJ noted that he was going to order a psychological consultative evaluation to determine whether Plaintiff suffers from significant depression or anxiety. In addition, the ALJ gave Plaintiff's attorney 45 days to submit additional evidence.  (Tr. 425-27)

### III.  Medical Evidence

January 4, 2001 x-rays of Plaintiff's cervical spine taken at Missouri Baptist Hospital in Sullivan, Missouri revealed progression in degenerative bilateral hypertrophic spurring and neural foraminal encroachment at C5-6 when compared to an exam dated July 1999. (Tr. 318)

On April 17, 2001, Plaintiff complained of back and right leg, along with knee pain.  Plaintiff was diagnosed with low back pain and degenerative joint disease in the knee.  Plaintiff returned on July 5, 2001, complaining of low back pain.  The examining physician recommended an MRI.  (Tr. 230-31)

An MRI of the lumbar spine dated July 8, 2001 revealed multilevel degenerative disk disease and facet disease with changes most severe at L4-5 and L5-S1. The results also showed lateralization to the left at L5-S1 with lateral recess stenosis, left greater than right.  Additionally, the radiologist noted spinal canal stenosis L4-5 with lateralization of degenerative disk disease to the left. (Tr. 229, 316)  On July 13, 2001, the Plaintiff consulted physician in an attempt to quit smoking.  (Tr. 228)

Dr. Mohammed N. Islam evaluated Plaintiff in the Emergency Department at Missouri Baptist Hospital in Sullivan, Missouri on April 18, 2002 for right facial numbness, dizziness and weakness, and chronic neck pain. His diagnoses was Transient Ischemic Attack (TIA) vs. Bell's Palsy. Dr. Islam recommended that Plaintiff follow up with her primary care physician, Dr. Modad and undergo a

carotid ultrasound and cervical spine x-ray. (Tr. 305-06)

On April 23, 2002, Plaintiff underwent an ultrasound of the common carotid artery bifurcations and vertebral arteries. Doppler evaluation revealed total occlusion of the left internal carotid artery and severe stenosis of the right internal carotid artery. In addition, x-rays of the cervical spine demonstrated extensive degenerative changes at the C5-C6 level. (Tr. 302-03)

Dr. Michael A. Beardslee evaluated Plaintiff on May 31, 2002, at the request of Dr. Musa Modad, for complaints of exertional chest discomfort and carotid disease. Dr. Beardslee noted that Plaintiff recently experienced a transient "mini stroke", characterized by weakening of her voice while working in her yard and accompanied by some right upper extremity weakness. After being seen by Dr. Modad, she had two episodes, the most recent occurring one week before her appointment and lasting fifteen to twenty minutes. The episode consisted of some visual disturbance and some upper extremity weakness. Over the past month she experienced some exertional chest discomfort which she described as a "brick on her chest" that occured with physical activity such as lifting or walking fast. Her past medical history included recurrent TIAs, severe carotids disease, chest discomfort, hyperlipidemia, osteoarthritis, and tobacco abuse. Dr. Beardslee's assessment was severe carotid disease bilaterally with recurrent neurologic events despite aspirin and Plavix. Dr. Beardslee consulted vascular surgery service, which recommended carotid endarterectomy on the right. Plaintiff scheduled an appointment for the procedure the following week. (Tr. 262-64)

On June 1, 2002, Dr. David Gierada and Dr. C. Dallas Sorrell with Barnes-Jewish Hospital, performed and reviewed a Chest Radiography, Posteroanterior (PA), Lateral. The radiologists found mild left basilar atelectasis and a small round calcification in the right mid-lung consistent with old granulomatous disease. (Tr. 360)

On June 3, 2002, Dr. Colin Derdeyn performed a bilateral cervical carotid arterial angiography. He assessed complete occlusion of the left common carotid artery with collateral flow to the left cerebral hemisphere and 80% diameter stenosis proximal right internal carotid artery. (Tr. 358-59)

Dr. Patrick Geraghty performed a right carotid endarterectomy with Hemashield Finesse patch closure and intraoperative shunting on June 4, 2002. Plaintiff's post-operative diagnosis was high grade symptomatic right carotid artery stenosis with left carotid artery occlusion. (Tr. 342-45, 354-58)

Plaintiff continued to follow up with Dr. Geraghty from June 17, 2002 to December 23, 2002. On June 28, 2002, she reported for an unscheduled clinic visit with Dr. Geraghty, complaining of a ten minute episode of right facial numbness the previous week. Plaintiff had no other neurological events since her surgery, and the examination revealed no residual neurological deficit. Plaintif also underwent a carotid duplex study on that same date, which demonstrated that the right side was widely patent and the left side remained occluded. Possible etiologies for the symptoms included intracranial small vessel disease or some emboli flicking off her occluded left internal carotid artery. Dr. Geraghty recommended treatment that would fully anticoagulate her with Coumadin and Lovenox. Plaintiff's follow-up scan on December 23, 2002 showed elevation in her right carotid velocities but no disease. Dr. Geraghty was unsure whether the changes in velocities reflected a compensatory flow increase or was indicative of a proximal stenosis. He planned to schedule an MRA of the carotid and cerebral circulation in January and instructed Plaintiff to follow-up in one year with a carotid duplex. (Tr. 327-34)

On August 20, 2002, Plaintiff presented for an appointment with Dr. Musa Modad to establish

a primary care provider for her Coumadin dosage. (Tr. 224) Plaintiff returned to Dr. Beardslee on August 29, 2002 for follow-up of her chest pain, abnormal stress test, and carotid disease. He noted that Plaintiff had done well from a surgical standpoint, though she had some intermittent right facial numbness on exertion. She experienced no chest pain or shortness of breath since her surgery; however, she did complain of some intermittent leg cramps. Dr. Beardslee assessed an abnormal stress test with no angina or heart failure symptoms, currently well compensated with her current regimen. He made no changes but arranged for an outpatient lipid profile with AST and CK. She was to notify Dr. Geraghty of her facial numbness and follow up with him. In addition, Dr. Beardslee advised Plaintiff to follow up with him in four to six months. (Tr. 260-61)

On February 28, 2003, Plaintiff sought to change antidepressants. Dr. Modad prescribed Effexor. (Tr. 156) That same date, Plaintiff underwent a neck magnetic resonance (MR) angiography and head magnetic resonance (MR) angiography without contrast, which revealed left proximal internal carotid artery occlusion with high grade right carotid bifurcation stenosis. A cervical carotid arterial angiography performed on March 17, 2003 demonstrated postoperative changes in the distal common carotid artery with mild narrowing at origin of the internal carotid artery and proximal external carotid artery without measurable stenosis, along with occlusion of the left internal carotid artery at its origin without interval change. (Tr. 337-39, 347-50)

On March 24, 2003, Dr. Walter Lemann evaluated Plaintiff at the request of Dr. Geraghty. Dr. Lemann noted that Plaintiff previously had high-grade extracranial vascular disease requiring surgery on the right side. In addition, she had total occlusion of the left internal carotid and significant tobacco exposure history. She began to have repeat cerebrovascular based symptoms in late November 2002 following discontinuation of Coumadin. The symptoms were marked by

numbness of the right face, with her most recent spell in March 2003 involving right face and arm numbness along with blurred vision. She went to the hospital around March 18, 2003, and that evaluation raised questions about submitting her for extracranial/intracranial vascular bypass. Dr. Lemann noted that Plaintiff had recurrent cerebral vascular events suggestive of TIA. Plaintiff harbored a total left internal carotid occlusion and continued to smoke tobacco. He strongly recommended continuation of Caumadin and optimization of a therapeutic INR level in the 2.25 to 2.5 times control range. He agreed to monitor her Coumadin therapy. (Tr. 321-22)

On April 8, 2003, Plaintiff was transported by EMS to Missouri Baptist Hospital with chest pain and anxiety which was noted to be stress induced. (Tr. 278-81) On August 11, 2003, Plaintiff underwent a Lumbar MRI which revealed degenerative disc disease and facet disease at L5-S1 and L4-L5, with some focal central protrusion at L5-S1. In addition, the MRI demonstrated lateral recess stenosis on the right and left and borderline or mild canal stenosis at L5-S1, along with diffuse degenerative disc disease and moderate canal stenosis at L4-L5. (Tr. 174)

Dr. John Demorlis evaluated Plaintiff on behalf of Disability Determinations on August 28, 2003. Plaintiff reported that her left carotid artery was totally plugged, and the right one was really bad. In addition, she reported bad low back and neck pain. Dr. Demorlis conducted a full physical examination and assessed chronic low back pain secondary to DDD and spinal stenosis, especially at L4-L5; carotid atherosclerosis; right carotid endarterectomy 6/02; exogenous obesity; chest pain, probably non-cardiac; history of hyperlipidemia; hypertension; depression; history of GERD; status post total hysterectomy 1990; and 20 pack/year history of tobacco use until 6/03. In addition, Plaintiff's range of motion was normal in all areas. (Tr. 175-81)

On November 3, 2003, Dr. Geraghty noted that a follow-up duplex scan revealed continued

elevated velocities on the right, consistent with contralateral obstruction, but no evidence of recurrent stenosis. The left internal carotid artery remained occluded. He also noted worsening lumbar disc disease with sciatica. She was to continue on her Coumadin but begin taking aspirin if back surgery was anticipated. Dr. Geraghty advised Plaintiff to return in one year. (Tr. 133) Plaintiff requested a prescription refill and different nerve pills on February 26, 2004. (Tr. 156) Plaintiff called Dr. Geraghty on March 4, 2004, complaining of right facial tingling with arm and leg weakness. (Tr. 133)

Also on March 4, 2004, Plaintiff saw Dr. Modad for numbness in her face. (Tr. 154-55) She returned to Dr. Modad on May 10, 2004, complaining of fluttering in her chest. Dr. Modad assessed palpations and recommended further testing. (Tr. 150-51)

Paul W. Rexroat, Ph.D., performed a psychological evaluation on August 18, 2004 at the request of Disability Determinations. He found Plaintiff to be a reliable informant. Plaintiff reported health and money problems. Her health problems included back problems, heart problems, vascular problems, and arthritis. Plaintiff reported occasional mood swings but denied anxiety or depression. However, she did become stressed due to her health issues. After Plaintiff took the MMPI-2 test, Dr. Rexroat opined that Plaintiff had a mild to moderate level of depression, and she worried a great deal about her health. Dr. Rexroat noted that her emphasis on somatic problems and tendency to experience feelings as physical sensations suggested limited opportunity for psychotherapeutic intervention. His diagnostic impressions included low average intelligence and mild to moderate depression, which she denied or ignored. Plaintiff had difficulty distinguishing between the physical and emotional aspects of her distress. (Tr. 122-26)

With regard to functional limitations, Dr. Rexroat found that she had marked limitations in

activities of daily living; few limitations in social functioning; and an ability to sustain concentration, persistence, and pace. His diagnoses included major depression, recurrent, mild; problems with primary support group; occupational problems; financial problems; housing problems; and a GAF of 59. Her motivation was good, but the prognosis was guarded. (Tr. 126-27)

Dr. Rexroat also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). He opined that Plaintiff had moderate restrictions in her ability to interact appropriately with the public, supervisors, or co-workers. In addition, she had moderate limitations in her ability to respond appropriately to work pressures in a usual work setting and to changes in a routine work setting. (Tr. 129-31)

## IV. The ALJ's Determination

In a decision dated April 27, 2005, the ALJ found that Plaintiff met the disability insured status requirements of the Social Security Act on June 4, 2002 and had not engaged in substantial gainful activity since at least that date. The medical evidence established that Plaintiff had mild depression, degenerative disc and joint disease within the cervical and lumbar spines, obesity, hypertension, gstroesophogeal reflux disease, and carotid disease. However, she did not have an impairment or combination of impairments listed in or medically equal to the listings set forth in Appendix 1, Subpart P, Regulations No. 4. (Tr. 31)

Further, the ALJ determined that Plaintiff's allegations of symptoms or combination of symptoms so severe that they precluded all types of work activity were not consistent with the evidence as a whole and were not persuasive. Her impairments precluded frequently lifting and carrying more than 10 pounds and occasionally lifting and carrying more than 20 pounds. She had no other functional restrictions. In addition, the ALJ found that Plaintiff's depression was mild and

non-severe, and it did not significantly limit the range of light work she could perform. The ALJ thus determined that Plaintiff could perform her past relevant work as a waitress as she performed it. The ALJ concluded that Plaintiff was not, and had not been, under a disability as defined by the Social Security Act at any time since the alleged onset date of June 4, 2002 through the date of the decision. Therefore, she was not entitled to a Period of Disability, Disability Insurance Benefits, or Supplemental Security Income. (Tr. 31-32)

Specifically, the ALJ assessed Plaintiff's testimony and the medical records. The ALJ found that the medical records contained no documentation supporting Plaintiff's allegations of arthritis in her hands or supporting ongoing complaints of or treatment for depression or any other mental impairment. Plaintiff did receive psychotropic medications from her primary care physician. In addition, the non-medical records did not contain allegations of depression or anxiety. With regard to Dr. Rexroat's reports, the ALJ noted that some of the limitations found by Dr. Rexroat were inconsistent with his objective findings and the remaining medical records. Thus, the ALJ determined that the record did not support a finding of a severe mental impairment imposing limitations of function for 12 consecutive months. (Tr. 17-22)

The ALJ also assessed Plaintiff's complaints of chest pain and right upper extremity weakness, noting that Plaintiff's carotid disease was improved and did not result in ongoing and significant limitations of function. The ALJ found that medical treatment notes reflected infrequent episodes of neurological complaints and no confirmed medically determinable impairment for these complaints. The ALJ thus concluded that the medical records did not support Plaintiff's allegations of disability due to episodes of facial numbness, poor sleep, carotid disease, depression, chest pain, and arthritis in her hands. (Tr. 22-25)

11

With regard to Plaintiff's allegations of severe neck and head pain, as well as back and leg pain with numbness in the lower extremities, the ALJ noted that Plaintiff sought and received treatment for degenerative disc disease and degenerative joint disease of the cervical and lumbar spines. However, Plaintiff did not aggressively seek treatment, and treatment notes failed to report medical observations of significant signs, symptoms, and deficits in Plaintiff's neck, back, and extremities. The consultative examination demonstrated that Plaintiff had normal range of motion, strength, reflexes, and gait, as well as the ability to move around easily. These findings and other treatment notes undermined Plaintiff's credibility regarding allegations of severe back, neck, and leg pain and numbness. (Tr. 25-27)

The ALJ also noted that, despite Plaintiff's alleged onset date in June 2002, no treating physician recommended that she cease working, nor did any physician opine that Plaintiff would be unable to work for 12 consecutive months. Further, the record did not indicate that Plaintiff's work activity deteriorated as a result of her symptoms. Plaintiff's earnings record indicated a sporadic work history and low earnings and failed to bolster her credibility. In short, the ALJ found that Plaintiff's description of her symptoms and limitations of function not credible. As a result, the ALJ determined that Plaintiff was capable of performing the full range of light work as defined by the regulations. The ALJ noted that Plaintiff failed to meet her burden of establishing a more restrictive residual functional capacity (RFC). Plaintiff's job as a waitress, as she described, did not require more than light work. Thus, the ALJ determined that Plaintiff could return to her past relevant work as a waitress. Assuming, arguendo, that Plaintiff's job as a waitress did not qualify as past relevant work, she could perform other work existing in significant numbers in the national economy. The ALJ based this finding on Plaintiff's age, education, past relevant work experience, RFC for a full

range of light work, and the Medical-Vocational Guidelines (Grids). Therefore, the ALJ concluded that Plaintiff was not disabled, and had not been disabled, since the alleged onset date and through the date of the decision. (Tr. 28-31)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f).  Those steps require a claimant to show: (1) that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work.  Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836,

838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's

complaints under the <u>Polaski</u>[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. <u>Marciniak</u> 49 F.3d at 1354.

## VI. Discussion

In her Brief in Support of the Complaint, the Plaintiff asserts that the ALJ erred by excluding a medically determinable mental impairment, by failing to evaluate the combined effects of all Plaintiff's impairments, in determining the Plaintiff's RFC, and in determining that Plaintiff could return to her past relevant work as a waitress. The Defendant, on the other hand, maintains that the ALJ properly assessed the severity of Plaintiff's mental impairments, properly formulated Plaintiff's RFC and credibility, and properly determined that Plaintiff could perform her past relevant work as well as other jobs that existed in significant numbers in the national economy.

### A. The ALJ's assessment of Plaintiff's mental impairments

Plaintiff first argues that the ALJ erred by finding that her mental impairment was not severe. The Defendant notes that, while the ALJ did list mild depression as one of Plaintiff's impairments, the ALJ correctly determined that her mental impairments did not impose significant functional limitations. The undersigned agrees that the ALJ properly assessed Plaintiff's mental impairments. During the hearing, Plaintiff denied that she had any mental health problems, and she testified that she

---

[1] The <u>Polaski</u> factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).

had never been treated by a psychiatrist or psychologist. (Tr. 416-17) The ALJ noted that she had been prescribed some psychotropic medication. (Tr. 19)

"The mere existence, however, of mental disturbance is not per se a disability within the meaning of the Act." Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir. 1981) (citation omitted); see also Bellinger v. Astrue, No. 1:10CV39MLM, 2011 WL 9123, at *11 (E.D. Mo. Jan. 3, 2011). Further, Plaintiff did not list a mental impairment as one of her disabling impairments. Failure to allege depression or anxiety in her applications for disability benefits is a significant factor in determining the severity of an alleged mental impairment. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (finding substantial evidence in the record that plaintiff's depression did not result in significant functional limitations where plaintiff did not allege depression as the basis of her disability and failed to follow prescribed treatment).

Further, while Dr. Rexroat assessed moderate limitations to Plaintiff's ability to interact with co-workers and respond to work pressures, he noted that her depression was merely "mild." (Tr. 130) His more thorough report indicates an ability to understand and remember simple instructions, as well as sustain concentration and persistence. Plaintiff could also interact socially. (Tr. 126) Her GAF of 59 merely indicated only "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). Thus, the undersigned finds that the ALJ properly assessed Plaintiff's mental impairments and found that depression or anxiety did not significantly limit Plaintiff's ability to function.

## B. The combination of impairments

Plaintiff next argues that the ALJ erred by failing to evaluate the combined effects of all of

Plaintiff's impairments. Defendant contends that the ALJ properly evaluated all of Plaintiff's impairments.

The undersigned will address this more thoroughly below, however, the ALJ's decision reflects that the ALJ assessed all of Plaintiff's alleged impairments and determined that "[t]he allegations of symptoms, or combination of symptoms, of such severity as to preclude all types of work activity are not consistent with the evidence as a whole and are not persuasive." (Tr. 31)  The ALJ specifically listed her impairments as "mild depression, degenerative disc and joint disease within the cervical and lumbar spines, obesity, hypertension, gastroesophogeal reflux disease, and carotid disease." (Tr. 31) Contrary to Plaintiff's assertions, the ALJ did "consider the combined effects of [Plaintiff's] numerous physical impairments as well as her mental impairments." Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir. 2000).

### C.  Plaintiff's Residual Functional Capacity

Next, the Plaintiff argues that the ALJ erred in determining her RFC.  The Defendant, on the other hand, maintains that the ALJ properly assessed the evidence and determined that Plaintiff had the RFC to perform the full range of light work.  The undersigned agrees with the Defendant.

With regard to residual functional capacity, "a disability claimant has the burden to establish her RFC." Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) (citation omitted).  The ALJ determines a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). "An 'RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and

nonmedical evidence (e.g., daily activities, observations).'" Sieveking v. Astrue, No. 4:07 CV 986 DDN, 2008 WL 4151674, at *9 (E.D. Mo. Sept. 2, 2008). Some medical evidence must support the RFC determination. Eichelberger, 390 F.3d at 591 (citation omitted).

First, the ALJ assessed the inconsistencies between the medical evidence and Plaintiff's allegations. While an ALJ may not discredit a plaintiff's subjective allegations of pain solely because the allegations are not supported by objective medical evidence, an ALJ can make a factual determination that the subjective complaints are not credible in light of contrary objective medical evidence. Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) (citations omitted)). The ALJ noted Plaintiff's testimony regarding the limitations resulting from her alleged impairments. The ALJ also noted that the record did not contain a confirmed medically determinable impairment of arthritis in Plaintiff's hands, nor was there any evidence of ongoing treatment for mental complaints. In addition, the medical did not document ongoing treatment for chest pains, angina, or pulmonary/respiratory problems. Indeed, Plaintiff's carotid disease significantly improved and had not resulted in ongoing and significant limitations of function. Treatment notes also failed to reflect ongoing symptoms imposing significant limitations of function with regard to Plaintiff's episodic complaints. In addition, Plaintiff did not seek aggressive treatment for her neck, head, back and/or leg pain and numbness. "A failure to seek aggressive treatment is not suggestive of disabling back pain." Ratio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988). Dr. Demorlis noted Plaintiff's normal gait, cervical motion, and lumbar motion. He did not report any significant limitations of function, which undermined Plaintiff's credibility regarding allegations of severe back, neck and leg pain and numbness.

The ALJ also mentioned Plaintiff's poor work history, which detracted from her credibility.

"A lack of work history may indicate a lack of motivation to work rather than a lack of ability." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). Further, the ALJ found Plaintiff's allegations of significant limitations of daily activities to be not credible. She reported doing very few household chores. She was able to do her own banking, use the post office, and wash her clothes. She had good social skills and reported having quite a few friends with which she had coffee occasionally. She also went to church twice a week. However, while Plaintiff's daily activities demonstrate some limitations, "the ALJ was not required to believe all of her assertions concerning those daily activities." Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996).

In short, the ALJ properly assessed Plaintiff's subjective complaints and disbelieved her subjective reports based on inconsistencies in the record. See Eichelberger v. Barnhart, 390 F.3d 584, 589-90 (8th Cir. 2004) (holding that an ALJ may disbelieve subjective complaints of pain because of inherent inconsistencies and that the ALJ has the statutory duty in the first instance to assess a claimant's credibility). The ALJ then properly formulated Plaintiff's RFC in light of the evidence presented by the Plaintiff, noting that Plaintiff failed to meet her burden of demonstrating a more restrictive RFC. Thus, the undersigned finds that the ALJ properly determined Plaintiff's RFC in this case.

## D. Plaintiff could return to past relevant work as a waitress

The Plaintiff also argues that the ALJ erred in finding at step 4 that Plaintiff could perform her past relevant work as she described it. The Defendant maintains that the ALJ properly compared Plaintiff's RFC with the demands of her prior job as she described and properly found Plaintiff could return to her past relevant work as a waitress. The undersigned agrees with the Defendant.

In accordance with SSR 82-61, the ALJ determined that Plaintiff retained the capacity "to

perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it." SSR 82-61, 1982 WL 31387, at *2 (Soc. Sec. Admin. 1982). If a claimant has such an RFC, the ALJ should find that claimant not disabled. Id. Plaintiff described walking, standing, and frequently lifting no more than 10 pounds and never more than 20 pounds, which description fell within the ALJ's RFC determination.

The Defendant also points out that the ALJ went further with the decision and alternatively found at step 5 that Plaintiff could perform the full range of work at the light exertional level. Relying on the Grids, the ALJ found that a significant number of jobs existed in the national economy which Plaintiff could perform. As previously stated, the ALJ properly discredited Plaintiff's allegations of disabling impairments and found that the credible impairments did not preclude her from performing work at the light level. "[T]he regulations provide that when an individual meets all of the requirements of a particular Grid rule, the Grids may be used to satisfy the Commissioner's burden at Step Five of establishing that the claimant can perform other jobs that exist in significant numbers in the national economy." Banks v. Astrue, No. 1:09CV88 DDN, 2010 WL 2628645, at *6 (E.D. Mo. June 28, 2010) (citing 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(b)). Here, the ALJ properly determined that Plaintiff was an individual closely approaching advanced age, had a 10th grade, or limited education, and had a history of unskilled and/or semiskilled work. Grid Rules 202.17 through 202.19 and 202.10 through 202.12 provide that an individual of Plaintiff's age, education, and experience with the ability to perform work at the light exertional level is not disabled. Thus, the undersigned finds that substantial evidence supports the ALJ's determination at step 5 that Plaintiff could perform a significant number of work activities and was not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  <u>See Thompson v. Nix,</u> 897 F.2d 356 (8th Cir. 1990).

<u>/s/ Terry I. Adelman</u>
UNITED STATES MAGISTRATE JUDGE

Dated this <u>1st</u> day of March, 2011.